FILED'09 NOV 20 13:33USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBERT B. HICKS,                                          CV. 07-746-PA

        Petitioner,

   v.                                               OPINION AND ORDER

NANCY HOWTON,

        Respondent.


   NELL BROWN
   Office of the Federal Public Defender
   101 SW main Street, Suite 1700
   Portland, OR  97204

       Attorney for Petitioner


   JOHN KROGER
   Attorney General
   JONATHAN W. DIEHL
   Oregon Department of Justice
   1162 Court Street, NE
   Salem, OR  97301

       Attorneys for Respondent

Panner, District Judge.

Petitioner, an inmate at Oregon State Correctional Institution, brings this habeas corpus action pursuant to 28 U.S.C. § 2254. He challenges the legality of his 2001 state court convictions for sexual abuse, alleging ineffective assistance of trial counsel and appellate counsel. For the reasons set forth below, the Second Amended Petition for Writ of Habeas Corpus (#45) is GRANTED.

## BACKGROUND

Robert Hicks ("Hicks"), an individual with an IQ of 60, lived in an apartment complex with his wife of 2 1/2 years, Vera, and three of her children. On or about May 19, 2001, Hicks was questioned upon returning home from fishing regarding a report of sexually inappropriate touching. His first question to officers was what had he done wrong. (Respt.'s Ex. 109.) Hicks was asked if there was anything Amy could have mistaken for sexual touching and he replied he had gone into Amy's room a couple of times and had rubbed her head, back, and stomach, and when she asked him to stop, he did. (*Id.*) When asked why he had done this, he stated he did not know why, he had just done it. Asked if he regularly massaged the other children Hicks said "no." When asked if he rubbed Amy under or over her clothing Hicks replied it was always over her clothes. (*Id.*) Hicks told the officers that he had

2 - OPINION AND ORDER

taken some sex offender treatment and knew it was wrong to touch kids so he would never touch Amy. (*Id.*) He indicated his willingness to take a lie detector test. (*Id.*)

Hicks was arrested and indicted on three counts of Sexual Abuse in the First Degree alleging he touched Amy with his hand, over her pajamas, in February, March, and April of 2001. Although the State offered a plea deal of 20-22 months, Hicks went to trial. He was convicted by a jury on all counts, 11-1.

At the sentencing hearing, trial counsel gave the court a detailed intellectual assessment revealing Hicks had a Verbal IQ of 61, a Performance IQ of 65, a Full Scale IQ of 60, reading comprehension equivalent to a 3rd grade level - age equivalent to 8 years, 7 months, and an overall intellectual functioning in the deficient range - in the 5th percentile of the population. (Respt.'s Ex. 110 at 9-10.) The assessment noted "[IQ] scores between 55 and 70 are considered in the mild mental retardation range. . . ." (*Id.*) Counsel asked the court for concurrent sentencing in light of Hicks being in the 5th percentile intellectually and the likelihood he would be victimized in prison, but counsel did not otherwise raise the findings of Hicks's assessment for mitigation purposes. (Respt.'s Ex. 103, Trial Tr. at 127.)

A court ordered pre-sentence investigation report ("PSI")

3 - OPINION AND ORDER

noted Hicks's had last worked as a dishwasher in a restaurant, for approximately one and a half months in 1996 or 1997; as of 1994 he was receiving Social Security disability benefits; he was previously convicted of Sexual Abuse II in a plea in 1992, and was sentenced to 3 years probation, 70 days in jail, and assessed a $170 fee. (*Id.* at 1-8.) The report also noted Hicks told investigators after his arrest it was not uncommon for him to wake the children in the morning and get them ready for school, and that he sometimes rubbed Amy's head or stomach to wake her. (*Id.*) The report recommended consecutive sentencing noting "the present offense involves continued sexually assaultive behavior towards a 12-year-old female child . . .[,]" "persistent involvement in similar offenses[,]" and no mitigating factors.

Adopting the PSI recommendation, the sentencing court imposed three consecutive 75-month terms under Measure 11, for a total of 225 months imprisonment without the possibility of parole or sentence reduction.

Pre-trial investigation

Police reports show investigating officers interviewed: Vera Hicks, Amy Nelson, and Robert Hicks; Amber Fife, a neighbor; Toni Dozier, a neighbor; and Amanda Tecpile, a former neighbor. Investigating officers also received "a four page letter written by someone wishing to remain anonymous." The letter, "stating,

among other things, Robert Hicks was innocent and he was being framed by his wife. . . [,]" was submitted into evidence. (Respt.'s Ex. 109.)

Trial counsel met with Hicks for less than an hour "maybe twice" prior to trial, and his legal assistant met with Hicks briefly once when Hicks viewed Amy's videotaped interview by the director of the Lane County Child Advocacy Center. (Respt.'s Ex. 114 at 11-16 & 24-25.) Trial counsel's file contained no evidence witnesses were investigated or interviewed, either by counsel, his assistant, or an investigator. (Respt.'s Ex. 107 at 5.)

The trial

In pretrial discussions on the morning set for trial, counsel told the court there was "no way" the case would go beyond that day and the next "unless the sky falls." (Respt.'s Ex. 103 at 6.) The State gave an opening statement detailing the testimony the jury would hear about Hicks abusing Amy, and informing the jury some witnesses were cognitively impaired. (Id. at 7-14.) In his opening, defense counsel did not address the State's characterization of the case and upcoming testimony. Counsel told the jury:

> This case will be somewhat unusual in that you won't -
> - you may hear little or no evidence at all . . . from
> the defendant. It's our position that the State will
> not be able to prove the case in these circumstances.

I understand that as persuasive as counsel's statements may be, there is no evidence in the case yet and all the evidence has to come from the witness stand right here next to me.

I'm only going to ask you to do two things in this case. The first . . . listen very critically to the evidence of the witnesses and don't accept without critical analysis what is said as the gospel or that the interpretations are correct.

Secondly, . . . reserve your judgment until the actual end of the case . . . .

I think the one other fact you may hear is that the defendant, too, is cognitively disabled and also has difficulties in the same area as those that counsel indicated for some of his witnesses.

Tr. at 14-15.

Three of Hicks's neighbors, Amber, Toni, and Amanda, and a coffee house employee, Trisha Black were witnesses for the State. They testified to observing Hicks holding Amy's hand as they walked, putting his arm over her shoulder, touching her on the shoulder, or grabbing her bottom in the parking lot - all conduct they thought was inappropriate. Amber also testified that Amy told her Hicks touched her at night, over her pajamas. On cross-examination counsel asked one question: if Amy had told Amber she wanted Hicks out of the house. Amber replied they had never talked about it. (Trial Tr. at 23.) Trisha testified to a conversation she overheard between Hicks and his wife: "[H]e made a comment about: Oh, I'm going to shave off my mustache, and the other person said: No, you won't because I like you with

6 - OPINION AND ORDER

facial hair.  And he said:  No, the children don't.  And she said:  Because you're always hugging and kissing on that one's [Amy's] neck."  (Trial Tr. at 63-64.)  Through a few questions on cross-examination, trial counsel established only that the Hickses were customers at the coffee shop, and the conversation Trisha overheard occurred the summer of 2000.  (Trial Tr. at 64-66.)  Trial counsel did not cross-examine Toni or Amanda.

Amy testified Hicks touched her over her pajamas, when she was asleep, and that the touching stopped at the end of April.  (*Id.* at 41-44.)  She was not able to say if it was morning or night when she was touched.  (*Id.* at 36.)  An investigating officer testified Amy told her Hicks touched her in the morning.  (*Id.* at 53-58.)  Police reports include statements from Amy indicating Hicks touched her in the morning.  (Respt.'s Ex. 109.)  On cross-examination, trial counsel did not ask Amy about her statements to investigating officers and her testimony with respect to when the touching occurred.  Counsel asked Amy about the order in which she spoke with various people, and if the people she talked to were nice.  (Respt.'s Ex. 103, Trial Tr. 41-44.)

Police reports included statements from Amber, reporting Amy told her Hicks touched her in the morning, but trial counsel did not ask Amber about the differences in her statements to

investigating officers and her testimony that Amy told her touching occurred at night. (Respt.'s Ex. 109; Respt.'s Ex. 103 at 21.)  Amber was re-called by the State and asked about the confrontation she and her friend, "Kim," had with Hicks at the end of April/early May.  She testified they told Hicks to go home and abuse his daughter, and he got really upset. (Respt.'s Ex. 103 at 49-50.)  Vera's statement to investigators recalled the altercation stating: "Kim said 'He's a child molester.  Go in and rape your daughter, Amy.'"  (Respt.'s Ex. 109.)  Defense counsel cross-examined Amber asking only how long she had known Hicks. (Respt.'s Ex. 103 at 50.)

Vera testified about the family's living arrangements, daily life and schedule, and about speaking with Amy before asking Amber to talk to her. (*Id.* at 25-28.)  On cross-examination, trial counsel attempted to ask two questions: 1) who Vera was presently living with and, 2) if someone moved in immediately after Hicks left.  The State objected to both questions on grounds of relevance.  Trial counsel did not attempt to overcome the objections, nor did he make an offer of proof.[1]

Trial counsel called no witnesses after the court ruled against his offer of proof to call Hicks's mother.  She was going to testify that Hicks did not work due to his mental disability,

---

[1]Hicks noted in his PCR appeal that Vera had a boyfriend at the time of trial. (Respt.'s Ex. 120 at 10).

not because he was lazy.

Closing arguments began with the prosecutor stating:  "The testimony in this case is uncontroverted."  (*Id.* at 87.)   At counsel's objection, the court instructed the jury to disregard the remark.   The prosecutor proceeded, telling the jury "I'd submit to you that the only evidence submitted during this trial - -." Counsel again objected, and the court instructed the jury to disregard the remark.  (*Id.*)   The prosecutor then told the jury that to find Hicks not guilty they "must find that Amy Nelson is lying."  (*Id.* at 89.)   The court overruled counsel's objections, and the State repeated, "[t]o find that the defendant is not guilty you must find that Amy [ ] is lying because what [she] told you happened is Sex Abuse in the First Degree." (*Id.* at 89-90.)   In his closing, trial counsel argued the State had not proven its case with any physical corroboration but simply repeated accusations, that the witnesses described conduct that had not been charged or alleged by Amy, and that Amy made up the accusations because Hicks took privileges away.  (*Id.* at 99-108.) The State countered each of counsel's arguments in its final argument.  (*Id.* at 108-115.)

After the verdict, counsel asked that sentencing be scheduled to allow him to obtain a psychological evaluation of his client.   At the sentencing hearing, the court asked counsel

to clarify a several points in the PSI, notably regarding the criminal history worksheet. (*Id.* at 126.) Counsel then presented Hicks's intellectual assessment to the court and asked for concurrent sentencing, he expressed surprise at the lack of reasoning in the PSI, and he told the court "I believe the victim in the priors - - were closer in age. It was a statutory situation. It wasn't a child as in this case is my understanding." (*Id.* at 127-28.) The court asked Hicks if there was anything he would like to say and the following exchanged ensued:

> Hicks:  What am I suppose to say?
>
> Counsel:  There's nothing you need to say.  He just wants to know if there's something you want to say.
>
> Hicks:  What do I want to say?
>
> Counsel:  I don't know.  It's up to you.  If you don't want to say anything, say, "No, sir."
>
> Hicks:  No, sir.

(*Id.* at 128.) The court then imposed three consecutive 75-months sentences under Measure 11, for a total of 225 months imprisonment without the possibility of parole or sentence reduction.

<u>PROCEDURAL HISTORY</u>

Hicks directly appealed his convictions, with his appellate

attorney filing a *Balfour* brief comprised solely of Section A.[2]
The Oregon Court of Appeals affirmed without opinion, *State v. Hicks*, 186 Or. App. 373, 64 P.3d 584 (2003). Hicks did not seek review from the Oregon Supreme Court.

Hicks filed an Amended Petition for Post-Conviction Relief ("PCR"), but the PCR court denied relief in a general judgment, with Findings of Fact, Conclusions of Law drafted by the State. (Respt.'s Exs. 117, 118.) Hicks appealed. Appellate counsel filed Section A of a *Balfour* Brief. Hicks submitted a Section B, prepared by an inmate legal assistant, which detailed his mental retardation and its impact on the legal proceedings, and presented claims of ineffective assistance of trial and appellate counsel. (Respt.'s Ex. 120 at 6.) The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. *Hicks v. Bartlett*, 209 Or. App. 378, 148 P.3d 925 (2006); 342 Or. 416, 154 P.3d 722 (2007).

Hicks filed the instant petition raising four grounds for

---

[2]Upon concluding that only frivolous issues exist on direct appeal, a *Balfour* brief allows appointed counsel to meet constitutional requirement of "active advocacy" without violating rules of professional conduct. Section A, signed by counsel, contains a statement of the case, including a statement of facts, sufficient to apprise the court of the jurisdictional basis for the appeal, but contains no assignments of error or argument. Section B, signed only by the appellant, is a presentation of the issues that appellant seeks to raise but that counsel considers to be frivolous. *Balfour v. State of Oregon*, 311 Or. 434, 451-52, 814 P.2d 1069 (1991).

11 - OPINION AND ORDER

relief.  His Memorandum (#40) narrows his claims to two grounds for relief:  (1) ineffective assistance of counsel when trial counsel failed to properly investigate and cross-examine witnesses at trial; (2) ineffective assistance of appellate counsel when counsel failed to assign error to the trial court's decision to overrule counsel's objection to prosecutorial statements made during closing argument.  (#40, Mem. at 14.)  Hicks concedes Ground (2) was not raised in state courts and is procedurally defaulted, but seeks to excuse the default through a showing of actual innocence.  (*Id.* at 30.)  Hicks also concedes Ground (2) was first raised in his Memorandum, filed after the one-year statute of limitations period for habeas claims of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), but again argues actual innocence to excuse the untimeliness if the Court determines the claim does not relate back to claims presented in the first amended petition.  (#44, Petr.'s Sur-Reply at 3-4.)

## **DISCUSSION**

In light of Hicks clearly narrowing his claims for federal habeas relief to the two noted above, the Court considers all other claims to have been withdrawn and limits its discussion to address only the two claims argued in the Memorandum.

/ / /

12 - OPINION AND ORDER

## I.    Procedural Default

Federal habeas review of procedurally defaulted claims is precluded unless the prisoner can show "cause" for the procedural default and actual prejudice, or the prisoner demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice. *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The "miscarriage of justice" exception to procedural default applies to habeas petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citing *Murray*, 477 U.S. at 496). New reliable evidence must create a colorable claim of actual innocence, that the petitioner is innocent of the charge for which he is incarcerated, as opposed to legal innocence as a result of legal error. *See Id.* at 321.

As evidence of his innocence to excuse the procedural default of Ground Two, Hicks submits (1) the affidavit of Kimberly Hicks, his former sister-in-law, stating Vera Hicks told her on January 30, 2009, that she had lied to police and to the court regarding her ex-husband abusing her daughter because she hated him and didn't want to live with him, and (2) an investigator's report of an interview with Melissa Snow,

13 - OPINION AND ORDER

Petitioner's step-brother's girlfriend, stating Amy recanted her accusations of touching in a conversation with Melissa prior to trial. (#40, Mem. Ex. A and B.)  The Court finds the affidavit and report, together, constitute sufficient evidence of Hicks's actual innocence for this Court to conclude no reasonable juror would vote to convict upon hearing all available evidence. Petitioner, therefore, has met the standards for the miscarriage of justice exception to procedural default.

The Court also finds that Ground Two relates back to Hicks's Amended Petition, in which he alleged appellate counsel had failed to raise meritorious claims.  Ground Two arises out of the same core of operative facts - - appellate counsel's failure to raise meritorious claims and, thus, relates back to the timely filed Amended Petition. *See Mayle v. Felix*, 545 U.S. 644, 663-664 (2005).  Accordingly, Ground Two will be reviewed on the merits.

**II.  The Merits**

A.  <u>Standards and Scope of Review</u>

An application for writ of habeas corpus shall not be granted unless the adjudication in State court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

28 U.S.C. §2254(d).

"'Clearly established Federal law' is the governing legal
principle or principles set forth by the Supreme Court at the
time the state court renders its decision." *Lambert v. Blodgett*,
393 F.3d 943, 974 (9th Cir. 2004) *cert. denied*, 126 S. Ct. 484
(2005). A state court decision is "contrary to" clearly
established Federal law if it is "in conflict with", "opposite
to" or "diametrically different from" Supreme Court precedent.
*Williams v. Taylor*, 529 U.S. 362, 388 (2000).

Habeas relief may be granted under § 2254(d)(1) when "the
state court identifies the correct governing legal principle [ ]
but unreasonably applies that principle to the facts of the [ ]
case." *Lambert*, 393 F.3d at 974 (citing *Williams*).[3] "The state
court's application of . . . law must be *objectively
unreasonable*." *Williams*, 529 U.S. at 411 (emphasis added).

Habeas relief may be granted under § 2254(d)(2) when the
state court decision is based on an unreasonable determination of
the facts because the fact-finding process is flawed. Examples
of a flawed process include: making evidentiary findings without
holding a hearing, misstating the record, ignoring the record,

---

[3]*Holland v. Jackson*, 542 U.S. 649, 652 (2004) (*per curiam*)
(may be granted when the state court decision was objectively
unreasonable in light of the record before the court)

misapprehending the evidence presented. *Taylor v. Maddox*, 366 F. 3d 992, 1001 (9th Cir. 2004).

It is well established that the principles articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), govern claims of ineffective assistance of counsel. Under *Strickland*, a petitioner must prove that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Bell v. Cone*, 535 U.S. 685, 695 (2002); *Williams*, 529 U.S. at 390-91; *Strickland*, 466 U.S. at 687-88. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. "The right to the effective assistance of counsel is [ ] the right of the accused to require the prosecution's case to survive ... *meaningful* adversarial testing." *Unites States v. Cronic*, 466 U.S. 648, 656 (1984)(emphasis added). The reasonableness of counsel's conduct must be evaluated in light of the facts of the case and the circumstances at the time of representation. *Strickland,* 466 U.S. at 690.

/ / /

B.    Ground One

Hicks alleges ineffective assistance of counsel when trial counsel failed to properly investigate and cross-examine witnesses at trial. He contends the state court's denial of relief was an unreasonable application of *Strickland*. (#40, Mem. at 28.)    The Court agrees.

At the PCR trial, the court informed Hicks of its usual practice:

> What I do in advance of the trial is I review the trial memos and I try to review some of the exhibits . . . I don't review the trial transcript, just because it's so voluminous and so I tend to wait until after the trial to do that. So it's always my practice to wait until the trial to review the exhibits and to take the matter under advisement and notify counsel by letter opinion as to the decision.

(Respt.'s Ex. 116 at 3.)    Exhibits submitted to the PCR court included police reports, the PSI and the Intellectual Assessment, Appellant's *Balfour* Brief, the trial and sentencing transcript, and Hicks's PCR deposition. (Respt.'s Ex. 108.)    In its opinion letter denying relief, the PCR court stated it found the Defendant's memorandum persuasive and instructed Defendant's counsel to incorporate the arguments in preparing findings and conclusions. (Respt.'s Ex. 117.)

The Court is compelled to begin its analysis by noting the record makes it abundantly clear Hicks has significant cognitive impairments which raise serious questions as to his ability to

17 - OPINION AND ORDER

understand the severity of the charges against him, the risks inherent with going to trial, the option of a bench trial, the prospect of Measure 11 sentencing with the possibility of consecutive terms, and the consequences of not taking the State's plea offer of 22-months. Hicks's PCR memorandum was silent as to his cognitive impairment and told the PCR court "the best evidence supporting the claims is set forth in [Hicks's] deposition. (Respt.'s Ex. 107 at 5.) In arguing Hicks could not meet his burden of proof, the PCR Defendant stated Hicks's deposition responses "bordered on the comical" and quoted a few of his responses. (Respt.'s Ex. 112, at 4-5.) Defendant' memorandum further asserted:

> "[I]t appears that petitioner was completely apathetic during his months in jail and asked no question of . . . his defense attorney. In addition, it appears that petitioner did not even bother to tell his attorney that, as he now claims, he did not know what a trial was and he did not know (or even care) what would happen if he rejected the plea offer.
>
> Petitioner's apathy is unbelievable. The only reasonable conclusion to draw from [his] deposition testimony is that he is a thoroughly unreliable historian. Hence, when petitioner asserts in his trial memorandum that "the best evidence" in support of his claims is his deposition testimony, defendant can readily agree."

(*Id.* at 6.) The Court finds the PCR defendant's characterization of Hicks appalling and offensive given the record.

The Intellectual Assessment in the PCR record describes

Hicks's limited ability to read, reason, and solve previously unencountered problems, and specifies he is in the lowest 5% of the population intellectually. Hick's PCR deposition testimony exemplifies his limitations, notably when the Defendant asked about his understanding of the charges against him, the plea and his thoughts about going to trial, and the exclusion of his mother's testimony.[4] The Court is offended by, and strongly condemns the Defendant's inappropriate characterization of Hicks. Because the PCR court found the Defendant's memorandum persuasive, the Court concludes the memorandum caused the PCR court to misapprehend or ignore the record.

The trial transcript provides clear evidence that counsel did not subject the State's case to meaningful adversarial testing. First, in Amy's statements to investigators she alleged that Hicks touched her over her pajamas in the morning. Amber also told investigators that Amy told her the touching occurred in the morning. At trial, Amy testified the touching occurred "when she was asleep[,]" but she did not specify the timing despite the prosecutor offering her the opportunity to do so. Amber testified at trial that Amy told her the touching occurred

_____

[4]A complete review of the PCR deposition allows the reader to appreciate the extent of Hicks's cognitive impairments. While Hicks repeats legal phrases and terminology he has heard used in reference to his case, his ability to grasp their full meaning is clearly questionable from his responses to questions requiring any sort of reasoning.

19 - OPINION AND ORDER

at night.    Trial counsel never raised or challenged the
ambiguities or discrepancies in the witnesses accounts of the
touching.    Having established the defense theory that the State
could not prove its case, counsel's failure to challenge
ambiguous or contradictory statements by two key witnesses cannot
be explained or justified in light of the importance of witness
credibility to the State's case.

Second, an essential element of the crimes charged, and to
be proven beyond a reasonable doubt, was that the touching Amy
reported was done for the purpose of sexual arousal or
gratification. *See* Or. Rev. Stat. 163.427 & 163.303(6).    While
Amy testified that Hicks touched her "where he shouldn't have[,]"
on her "front privates[,]" over her pajamas, the State made no
attempt to establish that the touching was for sexual arousal or
gratification.    Trial counsel made no attempt to hold the State
to its burden of proving the touching was sexual, and failed to
seize on an plausible alternative explanation: Hicks openly
admitted to investigators that at times he caressed Amy on her
head, her back and her stomach, sometimes doing so to wake her
for school.

Third, Amber, Toni, and Amanda told investigators, and
testified at trial about conversations they had among themselves
about their suspicions regarding Hicks.    Toni told investigators

she started noticing things after Amanda suggested Hicks was abusing Amy. (Respt.'s Ex. 109.) Counsel did not cross-examine Toni or Amanda, and did nothing in cross-examining Amber to discern if the group's suspicions were fueled by gossip and/or bias against Hicks. Hicks did not attempt to hide his contact with Amy, and a number of the acts the witnesses characterized as inappropriate and sexual could have been perfectly innocent, for example holding hands with Amy or putting his arm around or on her shoulder. Given that no evidence was presented showing Hicks acted for sexual gratification or arousal, trial counsel's failure to challenge the witnesses' characterization of Hicks's conduct was an abdication of his duty to subject the State's case to meaningful adversarial testing.

The Court's review of the record leads to the conclusion that counsel performed little cross-examination and much of the testimony elicited on cross-examination established only background information, such as the investigators' employment history and whether Amy considered the people she spoke with nice, and did nothing to test the State's case. Counsel's failure to subject witness testimony to any semblance of testing fell below objective standards of reasonableness and below what is required of constitutionally adequate representation in light of counsel's defense theory that the State would be unable to

prove its case.

In addition, the PCR record establishes that counsel failed to make reasonable investigation in preparation for trial. PCR counsel noted that trial counsel's file contained nothing pertaining to the investigation of witnesses, by counsel or anyone else. A file devoid of notes pertaining to investigation in preparation for trial is clear evidence that no investigation occurred.

Trial counsel has a duty to conduct reasonable investigation and formulate the defense strategy accordingly. *Wiggins v. Smith*, 539 U.S 510, 921 (2003); *Strickland*, 466 U.S. at 691; *Riggs v. Fairman*, 399 F.3d 1179, 1182 (9th Cir. 2005); *Avila v. Galaza*, 297 F.3d 911, 918-10 (9th Cir. 2002). Here, trial counsel's failure to investigate caused him to forfeit motive as a defense argument and prevented him from overcoming the State's objections when he attempted to elicit information from Vera about who moved in with her after Hicks's arrest. Counsel's two questions strongly suggest that the issue had potential for the defense. The letter received by law enforcement, suggesting Hicks was being framed by his wife, was a clear signal to counsel, had he paid attention, that motive could be at issue. Kimberly Hicks's recent affidavit, stating Vera told her she had lied to police and to the court regarding her ex-husband abusing

Amy because she hated him and didn't want to live with him, and the PCR investigator's report of an interview with Melissa Snow, in which Melissa states Amy told her the accusations were not true and stemmed from her mom wanting Hicks out of the apartment, are evidence that Vera's motives should have, at a minimum, been investigated. Counsel did absolutely nothing to investigate Vera's motives, or those of the neighbors, leaving him unable to raise the issue on cross-examination, and unable to subject the State's case to meaningful testing. Counsel's failure to investigate motive clearly fell below objective standards of reasonableness.

It was also below objective standards of reasonableness, and beyond comprehension, for trial counsel to wait until after Hicks was convicted to investigate his client's cognitive impairments through an intellectual assessment. Hicks began receiving social security disability benefits in 1994, which establishes that his cognitive disabilities were pronounced and recognizable years before trial counsel's representation in 2001. Counsel was obviously aware there was an issue in that he briefly mentioned Hicks was impaired in his opening statement and he sought to have Hicks's mother testify that Hicks did not work due to mental impairments. Counsel's failure to obtain an intellectual assessment *prior to* trial and to take measures to ensure his

representation and advice were tailored to his client's circumstances is inexcusable and reprehensible.

Trial counsel's advice to Hicks to "think about" the plea offer, without further discussion or assistance, is clear evidence of counsel's complete failure to account for his client's mental retardation. Advising a client to "think about" a plea presumes the client is able to assess the situation he is in, weigh the pros and cons of going to trial – whether it be a bench trial or a jury trial – and, in this case, take into consideration Measure 11 sentencing and the possibility of consecutive terms of imprisonment. Asking a client to think about a plea is only reasonable advice when the client has the cognitive ability to do the necessary thinking, or is provided support. The Intellectual Assessment describes Hicks's limited ability to read, reason, and solve previously unencountered problems, and specifies he is in the lowest 5% of the population intellectually. Because trial counsel failed to investigate his client's impairment so as to appreciate its significance he utterly failed to provide Hicks with the guidance and support necessary for him to "think about" the plea he was offered. In his PCR deposition, Hicks was asked why he decided not to take the deal. The following exchange demonstrates Hicks's cognitive limitations:

Q:    And why did you decide not to take the deal?
A:    Humm?  Because - - humm?  Because I was innocent.
Q:    Did you think - - did you ask [counsel] what your
      chances of being acquitted were?
A:    No.
Q:    Do you know what I mean by "acquitted?"
A:    Yes.
Q:    Okay.  Weren't you concerned about whether you
      were going to be convicted or acquitted?
A:    No.
Q:    Why didn't that concern you?
A:    At the time - - it didn't really concern me at
      that time, because I was just . . .
Q:    Weren't you afraid that you might get Measure 11
      time?
A:    Yes.
Q:    Did you ever ask [counsel] what your chances of
      prevailing were?
A:    No.
Q:    You just weren't that concerned about it?
A:    Not - - not at the time.
Q:    Are you concerned about it now?
A:    No.
Q:    Okay.  What is your total sentence, Mr. Hicks?
A:    Got - - it's 18 years.
Q:    Well, that's a long bit of time, isn't it?
A:    Well, I've already done two and half, and I've got
      16 to go.

(Respt.'s Ex. 114 at 24-26.)

     Under *Strickland*, counsel's performance must be measured
based on the circumstances in existence at the time of
representation.  The circumstances of this case required that
counsel investigate and effectively cross-examine witnesses.  He
failed to do so, and there is a reasonable probability that, but
for counsel's unprofessional errors, the result of the proceeding
would have been different.  Moreover, the record demonstrates
counsel's conduct so undermined the proper functioning of the
25 - OPINION AND ORDER

adversarial process that the trial cannot be relied on as having produced a just result. In addition, the PCR court's reliance on the PCR Defendant's memorandum and gross mischaracterization of Hicks's responses to the legal proceedings necessarily resulted in a misapprehension of the record. The Court thus concludes it was an unreasonable application of *Strickland* to deny Hicks's claim of ineffective assistance of trial counsel and habeas relief on Ground One is warranted.

C.  <u>Ground Two</u>

Hicks alleges ineffective assistance of appellate counsel for counsel's failure to assign error to the trial court's decision overruling the objection to prosecutorial statements made during closing argument. The *Strickland* standards outlined above apply to reviewing claims of deficient representation by appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Appellate counsel's representation must be reviewed in the context of the circumstances existing at the time of representation, that is, he was charged with reviewing the record and filing an appeal for a client with documented cognitive disabilities.

In closing statements the prosecutor told the jury:

So then the only question remaining is what Amy said the defendant did, did he do it? If you believe her, if you believe her, he is guilty of the crimes for which he is charged. He's not charged with rape, he's

26 - OPINION AND ORDER

not charged with sodomy, he's charged with touching her
in an intimate part.    It doesn't matter if it's
underneath the clothing or outside the clothing if,
when he did it, he did it with a sexual purpose.
**I'd submit to you if you believe Amy [ ] , there can be
no other explanation but that he touched her for sexual
purpose.**
For the defendant to be found not guilty, you must find
that Amy [ ] is lying.

(Respt.'s Ex. 103 at 89.)    Trial counsel objected, but the court

overruled the objection, and the State continued:

> **To find that the defendant is not guilty you must find
> that Amy [ ] is lying because what Amy [ ] told you
> happened is Sex Abuse in the First Degree.**
>
> \* \* \*
>
> And **if you believe her, then it is your obligation to
> convict the defendant.**

(*Id.* at 90)(emphasis added).

The trial court's instructions to the jury included the

following:

> To prove this charge, the State must prove what are
> called four material elements.    Those must be proven
> beyond a reasonable doubt.
>     The four elements are, first, that the act
> occurred in Lane County, Oregon; second, that the act
> occurred in the months of February, march, or April;
> third, that the defendant inappropriately - - I'm
> sorry.    That the defendant knowingly subjected Amy [ ]
> to sexual contact; and four, that Amy [ ] was less than
> 14 years of age at the time.
>     "Sexual contact" means any touching of the sexual
> or other intimate parts of a person for the purpose of
> arousing or gratifying the sexual desire of either
> party.
>     You are instructed that the vaginal area is a
> sexual part as a matter of law.

(Respt.'s Ex. 103 at 118-119.)

The State's argument telling the jury that to acquit they must find Amy lied was outrageous and must be recognized for its full potential to mislead the jury as to the findings it was required to make for conviction. The trial court's jury instructions on the elements of Sexual Abuse, with its single reference to "purpose" in the definition of sexual contact, did little to counter the State's forceful repetition that Amy's truthfulness was determinative for conviction. Under Oregon law, what Amy said happened was sexual abuse *only if* the jury found the touching was for sexual gratification or arousal, not if the jury found Amy was telling the truth.

In filing a *Balfour* brief, appellate counsel advised the Oregon Court of Appeals that no meritorious issues existed for appeal. This was, in fact, not the case given the potential for the prosecutor's statements to confuse the jury as to a required element for conviction: a finding beyond a reasonable doubt that the touching at issue was for the purpose of arousing or gratifying the sexual desire of either party. Moreover, in filing a *Balfour* brief, appellate counsel put a client with significantly impaired reading, writing and reasoning skills in the position of having to formulate and write legal claims and supporting arguments for his appeal, something he was incapable

of.  This in effect denied Hicks his right to appeal, and the Court is left to wonder if appellate counsel bothered to review the Intellectual Assessment, or simply chose to ignore his client's impairment.

As with Ground One, the PCR court's reliance on the PCR Defendant's memorandum and gross mischaracterization of Hicks's responses to the legal proceedings necessarily resulted in a misapprehension of the record.  Appellate counsel's failure to raise an arguably meritorious claim, and his expectation that his cognitively impaired client do so in Section B of a *Balfour* brief was below objective standards of reasonableness and prejudiced his client.  Accordingly, the PCR court's adjudication was an unreasonable application of *Strickland*, and habeas relief on Ground Two is warranted.

/ / /

/ / /

/ / /

/ / /

**CONCLUSION**

Based on the foregoing, Hicks's Second Amended Petition for Writ of Habeas Corpus (#45) is GRANTED.  Respondent shall release Hicks from custody and vacate his convictions unless the State retries him within 60 days.  The Court notes Hicks has served 96 months in prison.

IT IS SO ORDERED.

DATED this  /9  day of November, 2009.

Owen M. Panner
United States District Judge

30 - OPINION AND ORDER